# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
)
**AMERICAN FEDERATION OF** )
**GOVERNMENT EMPLOYEES,** )
**LOCAL 812, *et al.*,** )
)
     **Plaintiffs,** )
)
     **v.** )     **Civil Action No. 09-1191 (ESH)**
)
**BROADCASTING BOARD OF** )
**GOVERNORS,** )
)
     **Defendant.** )
_____)

## <u>MEMORANDUM OPINION</u>

     Plaintiffs Verla Wiley and American Federation of Government Employees, Local 1812

("AFGE," "Local 812," or "the union") have brought this action against the United States

Broadcasting Board of Governors ("BBG" or "the agency") under the Freedom of Information

Act ("FOIA"), 5 U.S.C. § 552. Plaintiffs seek to compel disclosure of documents related to the

BBG's alleged refusal to grant Wiley, a union official and former BBG employee, unescorted

access to an agency facility known as the "Cohen Building." After searching its records, the

BBG identified 230 responsive pages, of which it produced 164 pages in their entirety, withheld

23 pages in their entirety, and produced 43 pages in redacted form. The BBG now moves for

summary judgment. Plaintiff Wiley, proceeding *pro se*, has cross-moved for summary judgment,

arguing both that the search was inadequate and that the redactions and withholdings are

improper; plaintiff AFGE has also cross-moved for summary judgment, arguing only that BBG's

search was inadequate. Upon consideration of the parties' submissions and the entire record, and

for the reasons discussed herein, defendant's motion is granted in part and plaintiffs' cross-

motions for summary judgment are denied in part.  Defendant will also be required to supplement its declarations, and the remainder of the parties' summary judgment motions will be held in abeyance pending the Court's review of defendant's additional declarations.

## BACKGROUND

The BBG is a federal agency that oversees the International Broadcasting Bureau ("IBB"), which carries out government-sponsored nonmilitary international broadcasting services through Voice of America ("VOA") and other entities.  *See generally* 22 U.S.C. §§ 6202, 6204, 6206.  The BBG itself is a bipartisan independent body composed of nine voting members: eight Governors appointed by the President (one of whom is appointed as Chairman) and the Secretary of State.  *See id.* § 6203(b).  AFGE Local 812 is the collective bargaining representative for a unit of BBG employees.  (AFGE's Statement of Material Facts as to Which There Is No Genuine Dispute ("AFGE SMF") ¶ 1.)  Wiley was a BBG employee for 39 years and, for all times relevant to this dispute, Local 812's vice-president.  (Wiley's Statement of Undisputed Material Facts ("Wiley SMF") ¶ 1; AFGE SMF ¶ 2.)  Wiley retired from the BBG in May 2005 but continues to serve as Local 812's vice-president.  (Wiley SMF ¶¶ 1-2; AFGE SMF ¶¶ 2-3.)

On February 2, 2007, the union filed a grievance under the Negotiated Labor-Management Agreement ("NLMA"), alleging that the BBG had violated the agreement by refusing to grant Wiley unescorted access to the "Cohen Building," a BBG office facility.  (AFGE SMF ¶ 8.)  Over two years later on March 13, 2009, Wiley wrote a letter to the agency requesting records under FOIA ("the FOIA request").  (*See* Wiley's Opp'n to Def.'s Mot. for Summ. J. & Mem. in Supp. of Cross-Mot. for Summ. J. ("Wiley Opp'n"), Ex. E ("FOIA

Request).)[1]  Wiley's letter stated that upon her retirement, the former director of the agency's Office of Security, John Wybenga, personally gave her an IBB "retiree badge" that enabled her to move freely around the Cohen Building without an escort; however, beginning in June 2006, the agency no longer treated that badge as valid for unescorted access, so Wiley "must sign in and be escorted at all times."  (*Id.* at 1.)  This, she asserted, "disrupted union business" and "hampered" her ability to perform her union duties.  (*Id.*)  Wiley's letter also asserted that the refusal to grant her unescorted access to the building "after [she has] come through [the agency's] security checkpoint system indicates that the BBG and the Office of Security believe that [she is] a security risk . . . ."  (*Id.*)

Wiley requested 14 categories of documents, summarized as follows:

(1) her security file from January 1999 to the present, including any record "regarding inferred security risks, building access, BBG retirees, the I.D. Badge and any other issues that included her name in the discussion";

(2) all records between "BBG/VOA/IBB management, the Office of Security, and intelligence agencies" regarding Wiley and "inferred security risks, building access, BBG retirees, the I.D. Badge and any other issues that included her name in the discussion";

(3) all records between "BBG management, IBB, VOA, and the Office of Security over the issues of the I.D. Badge, retirees, and access to the Cohen Building for [Wiley]";

(4) all records regarding "what prompted the Agency and the Office of Security to ban Verla Wiley from the building" in 2006 and why;

(5) all records "finding Verla Wiley a security risk," if the agency's decision to deny her unescorted access to the Cohen Building was a "risk-based decision" under Homeland Security Presidential Directive 12 ("HSPD-12");

(6) all records regarding "why [Wiley] wasn't told when [she] retired in 2005 that [her] retiree badge was not adequate for unescorted access to the Cohen Building" and that such access would require "a background investigation using the SF-86 form";

(7) all records "explaining why there is a need for [Wiley] to fill out any background investigation form when [her] retiree badge did not expire until 2009, and [she] continued

---

[1] The complaint characterizes the request as one made by both Wiley and the union. (Compl. ¶ 6.)

[her] union activities without a break in service after retiring from the agency";

(8) all records regarding agency policy "prior to 2004" for retired employees who continued to do "volunteer work" for Local 1812, in light of the Office of Security's purported statement that the policy "restricting BBG retirees' access to the Cohen Building was implemented on August 24, 2004";

(9) all records "informing employees that that IBB Identification Retiree Badges will no longer be valid for unescorted access to the building";

(10) all records "regarding the Building Committee, the deciding officials who allegedly in August 2004, voted to restrict retirees from having access to the building unless escorted, and why the decision to restrict was done at that particular time since there appeared to be no high terror alert and it was three (3) years after September 11, 2001";

(11) all records "regarding terror alerts from September 01, 2001 to September 30, 2004";

(12) all records regarding "why the Agency and the Office of Security applied an August 2004 policy for Retirees, instead of respecting Verla Wiley's rights" as a union official and "abid[ing] by the Negotiated Labor-Management Agreement";

(13) all records regarding "how other Union Executive Board Officers who had retired from the Agency were permitted to use their retiree badges until 2007 without the requirement of a permanent escort";

(14) "a copy of the follow-up recommendations and any other documents dealing with" criticisms of the Office of Security and Office of Personnel that were made in a 1993 document entitled "A Just Workplace Task Force Report," which was issued by the BBG's former parent agency.

(*See* FOIA Request at 2-4.)

On March 16, 2009, Wiley's request was received by Martha Diaz-Ortiz, the BBG's FOIA officer. (Def.'s Statement of Material Facts as to Which There Is No Genuine Dispute ("Def.'s SMF") in Supp. of Mot. for Summ. J. ("Def.'s Mot.") ¶ 1.)[2] The agency classified the

---

[2] Local Civil Rule 7(h) requires that oppositions to a motion for summary judgment "shall be accompanied by a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated, which shall include references to the parts of the record relied on to support the statement." Local Civ. R. P. 7(h). AFGE did not file such a statement of disputed facts. Accordingly, the Court may assume that AFGE has admitted each factual assertion in defendant's statement of material facts. *See id.* By contrast, although Wiley did not file a separate statement of disputed facts, her memorandum in opposition to defendant's motion does specifically dispute many parts of defendant's

request as one made under the Privacy Act and did not charge Wiley any fee. (Def.'s SMF ¶ 1.) On March 25, Diaz-Ortiz forwarded the FOIA request to Michael Lawrence, the agency's Director of Security, and requested that the Office of Security search for responsive documents. (Def.'s Mot., Decl. of Martha Diaz-Ortiz ("Diaz-Ortiz Decl.") ¶ 3.) At Diaz-Ortiz's request in March or April 2009, Carol Durika, the chief of the User Services Division in the agency's Office of Computing Services ("OCS"), restored former security director Wybenga's email account and network files, as well as subsequent backup files, from January 8 through 14, 2009. (Def.'s SMF ¶ 4; *see also* Diaz-Ortiz Decl. ¶ 5.) However, no records related to Wiley's FOIA request were located. (Def.'s SMF ¶ 4.) During an April 17 meeting, Diaz-Ortiz informed Wiley and union president Timothy Shamble that "because [Wiley's] request was voluminous and required consults with additional components of BBG, the Agency would require additional time, beyond 20 days to respond to her request." (*Id.* ¶ 2; *see* Diaz-Ortiz Decl. ¶ 4.) *See* 5 U.S.C. § 552(a)(6) (giving agency 20 days after request's receipt to determine whether it will comply and providing for extensions of time).

On May 13, 2009, AFGE's counsel wrote to Diaz-Ortiz about Wiley's FOIA request, stating that Wiley had not yet received any response from defendant. (*See* Wiley Opp'n, Ex. B at 1 ¶ 1.) The letter asserted that the agency's failure to respond within the statutory time limit constituted "constructive exhaustion of administrative remedies." (*Id.* at 1-2 ¶ 3.) It also stated that if the agency did not "respond to Ms. Wiley's request" by March 27, "the Union will commence an action in federal district court to enforce her rights to a response" and would seek attorney's fees for the agency's "unjustified failure to respond to Ms. Wiley's March 13, 2009

---

statement of facts. (*See generally* Wiley Opp'n at 11-18.) Unlike AFGE, Wiley is proceeding *pro se*. Thus, to the extent that her factual disputes are supported by record citations, the Court will liberally construe her filings as compliant with Rule 7(h).

request." (*Id.* at 2 ¶ 4.)

On June 29, 2009, Wiley and AFGE, jointly represented at that time by AFGE's counsel, filed this action seeking to compel defendant "to disclose agency records improperly withheld from Local 1812 and Verla Wiley." (Compl. at 1.) They seek an order of disclosure, an award of reasonable costs and attorney's fees pursuant to 5 U.S.C. § 552(a)(4)(E), and any other appropriate relief. (*Id.* at 4.)

On July 8, 2009, Diaz-Ortiz sent Wiley a copy of her security file in response to Item 1 of Wiley's FOIA request, but withheld a report created by the FBI as part of Wiley's background investigation on the ground that the record was not created by defendant. (Diaz-Ortiz Decl. ¶ 6; AFGE SMF ¶ 14.) On July 29, Diaz-Ortiz wrote to Wiley to provide additional documents in response to her FOIA request. (*See* Wiley Opp'n, Ex. A.) Diaz-Ortiz explained that the agency was also granting Wiley's requests for Items 2, 3, 4, 6, and 8, subject to redactions for individual privacy under FOIA Exemption 6.[3] (*See id.* at 1-4.) She further explained the agency had not located any records responsive to Item 1's request for documents regarding "inferred security risks" and related issues, nor had it located records responsive to Items 5, 7, 9, 10, 11, 12, 13, or 14. (*See id.* at 1, 3-6.) The searches were conducted by six Security Specialists in the Office of Security, who searched emails, computer files, and hard copy files over the course of 16 hours, and by the IBB's chief of staff, who had spent an hour reviewing her emails and working files for all but Item 1. (*See id.*)

---

[3] With respect to Item 4, defendant asserted that the documents being produced were excerpted from materials covered by Exemption 2 as "predominantly internal" documents, but that "[w]ithout waiving Exemption [2], the agency does not see foreseeable harm in releasing the portion that addresses retiree access and visitor access." (Wiley Opp'n, Ex. A. at 2.) The letter also stated that several relevant documents were directives issued by other agencies, and therefore did not constitute records that BBG was obligated to disclose under FOIA; however, defendant did provide Wiley with contact information for the relevant agencies' FOIA officers. (*Id.*)

On September 4, 2009, AFGE's counsel sent a letter to defendant characterizing the agency's production as inadequate because, *inter alia*, the union had located in its own files three BBG documents that were purportedly responsive but not produced. (*See* Wiley Opp'n, Ex. F at 2 ¶ 7.) On September 17, during a telephone call between AFGE and agency counsel, the agency agreed to conduct a further search for documents. (AFGE SMF ¶ 19.) On October 13, the BBG produced three additional documents, as well as some of its document retention policies; the next day, the BBG also produced a partially redacted document. (*Id.* ¶¶ 20-21.) On October 22, AFGE's counsel sent a letter to defendant requesting, *inter alia*, that the agency search the files of 11 named current and former BBG employees (including the BBG's former chairman and several VOA officials), "[a]ll members of the Building Security Committee" from 2004 through the present, and Carol Booker, former BBG general counsel. (*See* Wiley Opp'n, Ex. G at 2-3 ¶¶ 5.)

On November 24, 2009, Wiley filed a *pro se* motion for an emergency status hearing because she believed that the agency was ignoring her FOIA request in bad faith. (*See* Wiley's Request to Have the Parties Appear before the Court.) She made the request *pro se* instead of through counsel because of unresolved "concerns about the case which [she] ha[d] previously expressed to [c]ounsel," and because AFGE was purportedly making decisions and engaging in settlement negotiations without informing her. (*Id.* at 4 ¶¶ 5-6; *see also id.*, Ex. C.) On November 30, AFGE's counsel moved for permission to withdraw as counsel for Wiley, on the grounds that Wiley failed to consult with them when seeking the emergency hearing, and that this and other conduct by her "placed [her] interests in conflict with those of AFGE Local 1812 . . . ." (AFGE Counsel's Mot. to Withdraw at 2 ¶ 2.) During a December 9 status conference, the Court granted AFGE's counsel's motion to withdraw, and Wiley subsequently filed a notice that

she would litigate this action *pro se*. That same day, defendant produced two additional pages of documents (AFGE SMF ¶ 24), with a total of 207 pages released in full or in part and 23 pages withheld in their entirety. (Def.'s SMF ¶ 6.)

On December 22, 2009, defendant produced to Wiley electronic copies of 121 pages, including several documents that were not responsive to the FOIA request but which had been sought by the union's counsel, such as 44 pages of document retention policies and 16 pages of emails among BBG personnel purporting to document their search for responsive documents. (AFGE SMF ¶ 25.) That same day, defendant moved for summary judgment and supported its motion with declarations by 27 agency employees who conducted record searches between March and October 2009. (*See generally* Diaz-Ortiz Decl.; Def.'s Mot., Decl. of Patricia Hargrave ("Hargrave Decl."); *id.*, Decl. of Carol Durika ("Durika Decl."); *id.*, Ex. A (24 declarations).) AFGE and Wiley filed separate consolidated oppositions and cross-motions for summary judgment on February 26 and March 8, 2010, respectively. The agency replied to AFGE's opposition but did not file a separate reply to Wiley's brief.

## ANALYSIS

## I.     STANDARD OF REVIEW

The Court may grant a motion for summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of demonstrating an absence of a genuine issue of material fact in dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Factual assertions in the moving party's affidavits may be accepted as true unless the opposing party submits his own affidavits or declarations or documentary evidence to the contrary. *Neal v. Kelly*, 963 F.2d

453, 456 (D.C. Cir. 1992).

"FOIA cases typically and appropriately are decided on motions for summary judgment." *Defenders of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009) (citations omitted). "In a FOIA case, summary judgment may be granted to the government if 'the agency proves that it has fully discharged its obligations under the FOIA, after the underlying facts and the inferences to be drawn from them are construed in the light most favorable to the FOIA requester.'" *Fischer v. Dep't of Justice*, 596 F. Supp. 2d 34, 42 (D.D.C. 2009) (quoting *Greenberg v. U.S. Dep't of Treasury*, 10 F. Supp. 2d 3, 11 (D.D.C. 1998)). The requester may challenge such a showing by "set[ting] out specific facts showing a genuine issue for trial," Fed. R. Civ. P. 56(e), that would permit a reasonable jury to find in his favor. *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir.1987). However, agency affidavits "are afforded a presumption of good faith," and an adequate affidavit "can be rebutted only 'with evidence that the agency's search was not made in good faith.'" *Defenders of Wildlife v. U.S. Dep't of Interior*, 314 F. Supp. 2d 1, 8 (D.D.C. 2004) (quoting *Trans Union LLC v. Fed. Trade Comm'n*, 141 F. Supp. 2d 62, 69 (D.D.C. 2001)). In other words, a requester cannot rebut the good faith presumption through "'purely speculative claims about the existence and discoverability of other documents.'" *SafeCard Servs., Inc. v. Sec. & Exch. Comm'n*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (quoting *Ground Saucer Watch, Inc. v. Cent. Intelligence Agency*, 692 F.2d 770, 771 (D.C. Cir. 1981)). But "if the sufficiency of the agency's identification or retrieval procedure is genuinely in issue, summary judgment is not in order." *Weisberg v. U.S. Dep't of Justice*, 627 F.2d 365, 370 (D.C. Cir. 1980) (internal quotation marks omitted).

## II.    ADEQUACY OF SEARCH

Both plaintiffs contend that defendant's search was inadequate.  While some of their challenges to the search's adequacy are unpersuasive, some of their arguments are meritorious.  As a result, the Court will grant defendant's motion only in part and require the agency to supplement its declarations; after considering those declarations, the Court will rule on the remainder of defendant's motion.

"[T]he adequacy of a FOIA search is generally determined not by the fruits of the search, but by the appropriateness of the methods used to carry out the search."  *Iturralde v. Comptroller of Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003).  The Court applies a "'reasonableness' test to determine the 'adequacy' of search methodology," *Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 27 (D.C. Cir. 1998), and requires a "reasonable and systematic approach to locating the requested documents . . . ."  *Center for Pub. Integrity v. FCC*, 505 F. Supp. 2d 106, 116 (D.D.C. 2007).  "The agency must demonstrate that it 'made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested.'"  *Fischer*, 596 F. Supp. 2d at 42 (quoting *Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990)).

The agency submitted 27 declarations by employees that describe the files reviewed and search terms.  One declaration was submitted by information technology specialist Carol Durika, who restored electronic files of Wybenga and another former agency employee, George Moore, between March and May 2009.  (*See* Durika Decl. ¶¶ 3-4.)  Thirteen declarations were submitted by employees with security-related responsibilities, including IBB chief Marie Lennon, all of whom conducted searches in July 2009, shortly after this action was filed.  (*See* Def.'s Mot., Ex. A at 3 ("Franklin Decl."), 4 ("Lawrence Decl."), 5 ("Lang Decl."), 6 ("Kotarski Decl."), 7

("Woodland Decl."), 8 ("Birch Decl."), 9 ("Lagerberg Decl."), 10 ("Hodge Decl."), 11 ("Proctor

Decl."), 12 ("Jansen Decl."), 13 ("Panone Decl."), 14 ("McCormick Decl."), 24 ("Lennon

Decl.").)  The remaining thirteen declarations describe searches conducted in October 2009 by

three employee relations officials, including human resources director Donna Grace, as well as

ten attorneys and paralegals, including Diaz-Ortiz and ethics official Patricia Hargrave.  (*See id.*

at 1 ("Maloney Decl."), 2 ("Borum Decl."), 15 ("Grace Decl."), 16 ("Baldwin Decl."), 17

("Munn Decl."), 18 ("Righi Decl."), 19 ("Jaiswal Decl."), 21 ("Parish Decl."), 22 ("Kenealy

Decl."), 23 ("Kollmer-Dorsey Decl."), 25 ("Peterson Decl."); Diaz Ortiz-Decl.; Hargrave Decl.)

The later searches by human resources and legal staff were conducted in response to plaintiffs'

September 2009 post-litigation correspondence, which asserted that individuals in the Office of

Human Resources and the Office of General Counsel would likely have responsive documents.

(AFGE SMF ¶ 19; Hargrave Decl. ¶ 2; *see* Wiley Opp'n, Ex. F at 2 ¶ 4.)

As an initial matter, the Court rejects plaintiffs' arguments that defendant's failure to

produce any documents until after litigation commenced is evidence of bad faith or an

inadequate search.  (*See, e.g.*, Wiley Opp'n at 12-14, 18; *see also* AFGE's Mem. of P. & A. in

Supp. of Cross-Mot. for Summ. J. & Opp'n to Def.'s Mot. for Summ. J. ("AFGE Opp'n") at 5.)

"[I]n view of the well-publicized problems created by the statute's . . . time limits for processing

FOIA requests and appeals, the [agency's] delay alone cannot be said to indicate an absence of

good faith."  *Goland v. CIA*, 607 F.2d 339, 355 (D.C. Cir. 1978) (footnote omitted); *see also*

*Iturralde*, 315 F.3d at 315 ("[I]nitial delays in responding to a FOIA request are rarely, if ever,

grounds for discrediting later affidavits by the agency.").  Wiley requested an extensive search,

and several of her descriptions of the information are somewhat ambiguous.  The record shows

that the agency began searching for responsive documents shortly after receiving the request (*see*

Diaz-Ortiz Decl. ¶¶ 2-5), and less than four months elapsed between the time of Wiley's request and the agency's first production of documents. Any delay in the response does not constitute grounds for denying defendant's motion for summary judgment.[4]

Wiley next argues that the search was inadequate because the agency improperly processed her FOIA request as a Privacy Act request.[5] (Wiley Opp'n at 11-12.) The Court is not persuaded. Wiley speculates, without support, that defendant sought to avoid FOIA's "broader" disclosure standards. (*Id.* at 12.) Her argument appears to rest upon defendant's assertion that the documents sought were "specific to Ms. Wiley." (Diaz-Ortiz Decl. ¶ 2.) It is true that Wiley's FOIA request did not only seek information about herself, because Items 8 through 11, 13, and 14 of the FOIA request did not reference her and instead sought documents related more generally to security alerts, building access, the "Building Committee," and an agency task force report. (*See* Wiley Opp'n at 11-12.) However, her speculation about the agency's interpretation of the request is inconsistent with the evidence. Diaz-Ortiz's second production of documents was characterized as a "response to [Wiley's] *FOIA* and Privacy Act" request and invoked FOIA exemptions. (*See id.*, Ex. A at 1 (emphasis added).) The agency also identified internal policy documents as responsive even though they are not specific to Wiley and do not reference her. (*See* Def.'s Mot., Ex. B ("Vaughn Index"), Docs. 3-5; *see also* In Camera Submission, Docs. 3-5.) Indeed, the only evidence of any distinction is that Wiley was not charged for the processing of her request. (*See* Wiley Opp'n, Ex. A at 5 (explaining that under BBG Privacy Act regulations, "the first copy of any Agency record regarding information under the Privacy Act is

---

[4] In the Court's view, the incidents cited by Wiley "suggest not bad faith, but rather that the [agency] was cooperating with [her] by . . . responding to [her] inquiries, conducting numerous additional searches, and producing records when error was discovered." *Meeropol v. Meese*, 790 F.2d 942, 953 (D.C. Cir. 1986).

[5] Wiley has made some arguments that AFGE has not.

provided free of charge"); *see also* Diaz-Ortiz Decl. ¶ 2.)

Wiley also criticizes the search of the files of former security director John Wybenga, whom she named in her FOIA request. She challenges Diaz-Ortiz's statement that she found no responsive documents when, in April 2009, the agency restored Wybenga's email account to its state prior to deactivation on January 9, 2009.[6] (Wiley Opp'n at 16-17, 20-21; *see* Diaz-Ortiz Decl. ¶ 5.) Wiley's argument is based on a misreading of the evidence. She contends that Diaz-Ortiz's declaration is undermined by a September 2009 email from OCS official Durika, who wrote that "[a]t this late date there is no way of recovering data deleted" in January 2009. (Wiley Opp'n, Ex. M ("Durika Email") ¶¶ 1, 3.) However, the plain meaning of Durika's statement is that *in September 2009*, OCS could not recover data that was deleted eight months earlier. As Durika's email further explains, upon Diaz-Ortiz's April 2009 request to search Wybenga's files, OCS was indeed able to restore Wybenga's email account to its pre-deactivation state, but it was unable to restore the individual emails that Wybenga himself had deleted before he left the agency. (*See id.* ¶ 2.) Thus, Durika's email is consistent with Diaz-Ortiz's declaration that the agency searched Wybenga's restored email account but found no responsive documents. (*See* Diaz-Ortiz Decl. ¶ 5.)[7]

Both plaintiffs also attack, without basis, the declaration by Frederick Lang, an IBB supervisory security specialist, regarding his own search of Wybenga's files. Lang declared that he searched Wybenga's "hard copy files"; that he requested Tony Ratliff, an IBB information technology specialist, to conduct a search of Wybenga's computer files using various search

---

[6] The account was deleted following Wybenga's departure from the agency.

[7] Wiley notes that Diaz-Ortiz's declaration does not specify what search terms she used when searching Wybenga's restored files. (Wiley Opp'n at 17.) This is immaterial, as Durika's email clarifies that the restored mailbox contained only "a few broadcast messages" because Wybenga had "cleared out his mailbox before leaving." (Durika Email ¶ 2.)

terms; and that "[t]his search yielded no responsive documents . . . ."  (Lang Decl. ¶ 3.)

Plaintiffs argue that defendant must also produce a declaration by Ratliff himself regarding the

electronic search.  (Wiley Opp'n at 17; AFGE's Reply in Supp. of Cross-Mot. for Summ. J. at 2.)

This is incorrect.  "[A]n agency may rely on an affidavit of an agency employee responsible for

supervising the search."  *Maynard v. C.I.A.*, 986 F.2d 547, 560 (1st Cir. 1993); *Carney v. U.S.

Dep't of Justice*, 19 F.3d 807, 814 (2d Cir. 1994) ("An affidavit from an agency employee

responsible for supervising a FOIA search is all that is needed to satisfy [the personal knowledge

requirement of Federal Rule of Civil Procedure] 56(e); there is no need for the agency to supply

affidavits from each individual who participated in the actual search."); *see also Kay v. F.C.C.*,

976 F. Supp. 23, 34 n.29 (D.D.C. 1997) ("Generally, declarations accounting for searches of

documents that contain hearsay are acceptable."), *aff'd*, 172 F.3d 919 (D.C. Cir. 1998).  Lang is a

supervisory official who delegated the electronic search to Ratliff, so Lang's declaration that the

search yielded no responsive documents is sufficient.[8]

Wiley similarly challenges the search of the emails of George Moore, the former IBB

deputy director who passed away in 2007.  (*See* Wiley Opp'n at 17.)  OCS official Durika

declared that upon Moore's death, the agency uploaded his emails onto the computer of Barbara

Brady, then an advisor to the acting IBB director, but that in April or May 2009, "all data [on

Brady's computer], including Mr. Moore's email, was lost" due to corruption of the hard drive.

(Durika Decl. ¶ 4.)  As Wiley notes, Durika did not sign her declaration, so the Court will require

defendant to file a signed version of Durika's declaration.  But contrary to Wiley's suggestion,

---

[8] Wiley also suggests that Lang's search of Wybenga's paper files was inadequate, since defendant subsequently located Wybenga's August 2004 memo to Hill.  (*See* Wiley Opp'n at 15.)  First, Wiley has no factual basis upon which to argue that the agency located this memo in Wybenga's paper files.  Second, even if the memo had been located among those files, the mere fact that Lang did not locate a single-page memo when reviewing Wybenga's hard copy documents does not demonstrate the unreasonableness of the agency's search methodology.

Durika's declaration, if signed, would be sufficient to establish that Moore's email was not available for review.

There is also no basis for plaintiffs to criticize the adequacy of the agency's search for the records of David Hill, a contract security officer who was the addressed recipient of an August 2004 memo from Wybenga about the new policy regarding unescorted access for holders of retiree badges. (Wiley Opp'n at 20; AFGE Opp'n at 8; *see* Wiley Opp'n, Ex. H.) Unlike Wybenga, Hill was not named in the underlying FOIA request. *Compare FPL Group, Inc. v. I.R.S.*, No. 09-CV-652, 2010 WL 890219, at *5 (D.D.C. Mar. 12, 2010) (FOIA request named specific offices and employees with whom documents could likely be located). And, there is nothing in the FOIA request that would have indicated that Hill would have been a likely custodian of responsive documents. "The agency is not required to speculate about potential leads. More specifically, the [agency] is not obliged to look beyond the four corners of the request for leads to the location of responsive documents." *Kowalczyk v. Dep't of Justice*, 73 F.3d 386, 389 (D.C. Cir. 1996). It was not until plaintiffs' September 2009 post-litigation correspondence when Hill was first identified as possibly having responsive documents. (*See* Wiley Opp'n, Ex. F at 2 ¶ 7.) This letter cannot expand the agency's FOIA obligations. "A reasonable effort to satisfy [a] request does not entail an obligation to search anew based upon a subsequent clarification," because "[r]equiring an additional search each time the agency receives a letter that clarifies a prior request could extend indefinitely the delay in processing new requests." *Kowalczyk*, 73 F.3d at 388. The adequacy of the search of Hill's records is therefore irrelevant to the adequacy of the agency's FOIA response,[9] and the fact that the agency

---

[9] For these same reasons, the agency was also not obligated to search the ten agency officials first named in AFGE's post-litigation letter of October 22, 2009, simply because plaintiffs identified those individuals at that time. (AFGE Opp'n at 6-7; *see* Wiley Opp'n, Ex. G at 2 ¶ 5.)

sought to accommodate plaintiffs' post-litigation clarification does not expand the underlying

request. (*See* Hargrave Decl. ¶ 6.)[10]

Wiley further criticizes the search terms used by the security personnel in July 2009 as

"deficient" because they did not produce many responsive documents, and she argues that the

human resources and legal personnel should not have re-used those search terms in October

2009. (*See* Wiley Opp'n at 18-19.) This argument fails, not least because it presumes

incorrectly that a search term is inadequate merely because it did not lead to the discovery of

documents; another possibility, of course, is that the searched files contained no responsive

documents.[11]

---

[10] Even if the agency were required to search Hill's records in response to Wiley's request, Hargrave's declaration demonstrates that the search of Hill's files was adequate. (*See* Hargrave Decl. ¶ 6.) There is no merit to plaintiffs' suggestion that Hill himself must submit a declaration (Wiley Opp'n at 20; AFGE Opp'n at 8), because Hargrave was supervising the search. *See Maynard*, 986 F.2d at 560; *Carney*, 19 F.3d at 814.

[11] Wiley also criticizes, to no avail, the fact that many of the agency's declarants did not search for the terms "security risk" or "AFGE." (Wiley Opp'n at 26.) However, her FOIA request "does not set forth a discrete list of search terms, and even if [she] had included such a list, there is no bright-line rule requiring agencies to use the search terms proposed in a FOIA request." *Physicians for Human Rights v. U.S. Dep't of Defense*, 675 F. Supp. 2d 149, 163-64 (D.D.C. 2009). "FOIA, requiring as it does both systemic and case-specific exercises of discretion and administrative judgment and expertise, is hardly an area in which the courts should attempt to micro manage the executive branch." *Johnson v. Executive Office for U.S. Attorneys*, 310 F.3d 771, 776 (D.C. Cir. 2002). Moreover, the FOIA items that used the phrases "security risk" or "AFGE" were all narrowed to issues relating to Wiley herself or to retirees. (*See* FOIA Request at 2-3 (Items 1, 2, 3, 5, 8, and 12).) The agency's declarations indicate that every digital file search used the term "Wiley," and many searched also used the term "retirees."

Plaintiffs' argument that the search was inadequate because different officials used different terms when searching their own files is also unpersuasive. (Wiley Opp'n at 26-30; AFGE Opp'n at 7 (discussing Donna Grace).) Not only did Wiley's original request fail to suggest specific search terms, but given that many of the declarants play different roles within the agency, there is no basis to doubt that defendant "properly exercised [its] discretion in crafting lists of search terms that [it] believed to be reasonably tailored to uncover documents responsive to the FOIA request. . . . [I]n responding to a FOIA request, an agency is only held to a standard of reasonableness; as long as this standard is met, a court need not quibble over every perceived inadequacy in an agency's response, however slight." *Physicians for Human Rights*, 675 F. Supp. 2d at 164.

Wiley also incorrectly argues that "the fact that additional responsive documents exist and were not located by [d]efendant in its records search demonstrates that the search was inadequate." (Wiley Opp'n at 15.) For example, she observes that although the agency produced an email from 2005 on which agency attorneys Elizabeth Parish and Timi Kenealy were purportedly copied, Parish and Kenealy's searches of their own files did not locate that email. (*Id.* at 29-30; *see id.*, Ex. P; Parish Decl.; Kenealy Decl.) Whether the agency located all copies of the records sought by plaintiff is not dispositive, for an agency's search is not presumed unreasonable because it fails to find every possibly responsive document. *See Steinberg v. United States Dep't of Justice*, 23 F.3d 548, 551 (D.C. Cir. 1994) (the question is not "whether there might exist any other documents possibly responsive to the request, but rather whether the search for those documents was adequate"). The agency must only demonstrate "that its search was reasonably calculated to uncover all relevant documents." *The Nation Magazine v. U.S. Customs Serv.*, 71 F.3d 885, 890 (D.C. Cir. 1995) (internal quotation marks omitted). The mere fact that the agency located the 2005 email in an unspecified location does not, on its own, suggest that Parish and Kenealy's searches were inadequate.[12]

By contrast, there is a genuine issue of material fact regarding the adequacy of the search conducted by Michael Lawrence, the BBG's present director of security. Lawrence declared that he searched his email account (including his sent mail) and other computer files on July 10, 2009, using nine search terms, including "retirees" and "unescorted access," but that the search did not yield any responsive documents. (Lawrence Decl. ¶ 2.) Three weeks later on July 28,

---

[12] There is also no genuine issue of material fact regarding the adequacy of the search conducted by Harinder Jaiswal, chief of the agency's labor and employee relations division. (*See* Wiley Opp'n at 30.) Both Jaiswal and agency attorney Hargrave declared that Jaiswal located documents related to "a grievance" filed by AFGE, so any discrepancy in their declarations regarding the year the grievance was filed is not material. (*See* Jaiswal Decl. ¶ 4; Hargrave Decl. ¶ 3.)

Lawrence forwarded to Diaz-Ortiz an email that he wrote on March 4, 2009, which used the terms "retirees" and "unescorted access."[13]  (*See* Wiley Opp'n, Ex. N.)  The fact that this email from *March* was in Lawrence's account on July 28 suggests that it was also in his account on July 10.  Yet, there is no explanation as to why the July 10 term-based search did not locate the document.  This failure raises the possibility that Lawrence may not have conducted his search correctly, and thus creates a genuine issue about "the sufficiency of the agency's identification or retrieval procedure" with respect to Lawrence's files.  *Weisberg*, 627 F.2d at 370 (internal quotation marks omitted).

There is also a genuine issue of material fact regarding the adequacy of the search of the agency's paper records.  (Wiley Opp'n at 18, 33; AFGE Opp'n at 7.)  Defendant states that "BBG's personnel conducted an electronic search, as well as a paper search for responsive materials."  (Mem. in Supp. of Def.'s Mot. ("Def.'s Mem.") at 12.)  Most declarants described searches of both digital and paper files, but there is no evidence that the paper files of six individuals were ever searched: former IBB deputy director George Moore, human resources director Donna Grace, former general counsel Carol Booker, and attorneys Timi Kenealy, Kataryna Baldwin, and MaryEllen Righi.  (*See* Durika Decl. ¶ 4 (describing search for Moore's emails only); Grace Decl. ¶ 2 (describing search of her "computer files" only); Borum Decl. ¶ 3 (describing search for Booker's emails); Hargrave Decl. ¶ 4 (describing search of Booker's digital files only); Kenealy Decl. ¶ 2 (describing search of her own and Booker's digital files only); Baldwin Decl. ¶ 2 (describing search of her own "computer files" only); Righi Decl. ¶ 2 (same).)  "It is well settled that if an agency has reason to know that certain places may contain responsive documents, it is obligated under FOIA to search barring an undue burden."  *Valencia-*

---

[13] The agency has produced this July 2009 email, which contains the forwarded March 2009 email.  (*See* Vaughn Index, Doc. 2; Wiley Opp'n, Ex. N.)

*Lucena v. U.S. Coast Guard*, 180 F.3d 321, 327 (D.C. Cir. 1999).  The agency's determination that it was worthwhile to search those individuals' digital files was reason enough to suggest that their paper files might also contain responsive documents.  If such paper files exist, the agency is obligated to review them.

Finally, there is a genuine issue of material fact regarding the adequacy of the search regarding Item 10 of the FOIA request.  (*See* Wiley Opp'n at 22-26; AFGE Opp'n at 7.)  This item sought information regarding "the deciding officials who allegedly in August 2004[] voted to restrict retirees from having access to the building unless escorted . . . ."  (*See* FOIA Request at 3.)  Although the FOIA request identified this agency entity as the "Building Committee," the evidence shows that the agency understood this to refer to the "Building Security Council" ("BSC").[14]  Thus, the request gave the agency "reason to know" that the BSC's records (or those of its members) "may contain responsive documents . . . ."  *Valencia-Lucena*, 180 F.3d at 327.  The declarations by Diaz-Ortiz and the other agency officials do not clarify whether the agency ever searched the records of the BSC or its members.  This omission is particularly noteworthy because, other than the FOIA request's broad references to "BBG/VOA/IBB management," the BSC was only one of three BBG entities that were specifically cited in the request.  Therefore, defendant is obligated under FOIA to search the records of the BSC or those of its members, or to show that it has already done so.[15]

In sum, defendant's motion is granted with respect to the adequacy of the agency's search, except with respect to (1) George Moore's emails, given the failure of Carol Durika to

---

[14] Some officials searched their files for the term "building security council" in July 2009, before plaintiffs' post-litigation correspondence specifically referenced the BSC.  (*See, e.g.*, Lawrence Decl. ¶ 2.)

[15] The agency has not argued that the security personnel who submitted declarations were members of the BSC.

sign her declaration, (2) Michael Lawrence's emails, given the unexplained failure of his July 10

search term review to locate a responsive email that he apparently later located on July 28, (3)

the paper files of Kataryna Baldwin, Carol Booker, Donna Grace, Timi Kenealy, George Moore,

and MaryEllen Righi, given that the agency's declarations state only that those individuals'

electronic files were searched, and (4) the records of the Building Security Council or its

members, given that there is no evidence that those records were ever searched.

## IV.     EXEMPTIONS

Wiley also challenges the agency's withholding and redaction of documents.  FOIA

requires disclosure of requested "agency records," *see* 5 U.S.C. § 552(a)(3), including "[a]ny

reasonably segregable portion of a record," absent a demonstration by the government that the

materials fall within one of nine exemptions.  *Id.* § 552(b); *see also Judicial Watch, Inc. v. Dep't

of Energy*, 412 F.3d 125, 128 (D.C. Cir. 2005).  The agency has invoked Exemptions 2, 5, and 6

to withhold certain documents in their entirety and to partially redact others.  (*See generally*

Vaughn Index.)  Based on a review of defendant's legal briefing and *in camera* submissions, the

Court concludes that the agency's withholdings and redactions are proper.

### A.     "Agency Records"

Wiley contests the agency's withholding of the FBI file contained within her security file.

(Wiley Opp'n at 37.)  In correspondence, the agency identified the FBI file as non-responsive on

the ground that it was not an "agency record" within the meaning of FOIA.  (*See* Diaz-Ortiz

Decl. ¶ 6; *see* In Camera Submission, Doc. 1 (FBI report).)  The agency submitted the FBI file

for *in camera* review.

In order for a document to be subject to FOIA disclosure, it must be an "agency record."

*See* 5 U.S.C. § 552(a)(4)(B).  FOIA does not define this term either in the statute's text or in its

legislative history. *See United States Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 142 (1989).

"[D]ocuments qualify as 'agency records' subject to FOIA disclosure if they are (1) created or

obtained by an agency, and (2) in the agency's control." *United We Stand America, Inc. v. I.R.S.*,

359 F.3d 595, 598 (D.C. Cir. 2004) (citing *Tax Analysts*). Here, it is uncontested that the agency

obtained a copy of the FBI file, so the only remaining question is whether the agency has

"control" of the documents. Whether defendant exercises sufficient control over the FBI file to

render it an "agency record" must be determined by examining "(1) the intent of the document's

creator to retain or relinquish control over the records; (2) the ability of the agency to use and

dispose of the record as it sees fit; (3) the extent to which agency personnel have read or relied

upon the document; and (4) the degree to which the document was integrated into the agency's

record system or files." *Id.* at 599 (internal quotation marks omitted). Based on the Court's

review of the document and statements by the FBI made therein (*see* In Camera Submission,

Doc. 1 at 00003, 00005, 00009, 00019), it is clear from the document's face that the FBI did not

intend to relinquish control over the records to the BBG or to permit the BBG to use and dispose

of the file as it sees fit. The BBG therefore lacks "control" of the FBI file, and defendant is

therefore not obligated to produce it as an "agency record."

**B.     Exemption 2**

Exemption 2 of FOIA exempts from disclosure matters "related solely to the internal

personnel rules and practices of an agency . . . ." 5 U.S.C. § 552(b)(2). The exemption "applies

to material used for predominantly internal purposes." *Schiller v. NLRB*, 964 F.2d 1205, 1207

(D.C. Cir. 1992) (internal quotation marks omitted). "If the threshold test of predominant

internality is met, an agency may withhold the material 'by proving that either [1] disclosure may

risk circumvention of agency regulation, or [2] the material relates to trivial administrative

matters of no genuine public interest.'" *Id.* (quoting *Schwaner v. Dep't of Air Force*, 898 F.2d 793, 794 (D.C. Cir. 1990)). "Predominantly internal documents the disclosure of which would risk circumvention of agency statutes and regulations are protected by the so-called 'high 2' exemption," and "[p]redominantly internal documents that deal with trivial administrative matters fall under the 'low 2' exemption." *Id.*

The agency has invoked the "high 2" exemption with respect to three documents, all of which were reviewed *in camera.* (*See* In Camera Submission, Docs. 3-5.) Based on its review of these documents, the Court agrees with defendant and finds that the material withheld under Exemption 2 relate to the internal practices of the agency, specifically "its internal security operating instructions, including instructions BBG security guards are given regarding appropriate security procedure." (Def.'s Mem. at 15.) These documents are "not concerned with regulating the behavior of the public, but consists solely of instructions to agency personnel" and does not "attempt to modify or regulate public behavior . . . ." *Crooker v. Bureau of Alcohol, Tobacco & Firearms*, 670 F.2d 1051, 1073 (D.C. Cir. 1981). As defendant argues, disclosure could assist "[p]ersons of interest" who seek "to alter their pattern of behavior in order to circumvent security procedures in a federal space." (Def.'s Mem. at 15.) The Court concludes that the agency has met its burden of establishing the applicability of Exemption 2 with respect to these documents.[16]

---

[16] "[D]istrict courts are obligated to consider segregability issues *sua sponte* even when the parties have not specifically raised such claims." *North v. U.S. Dep't of Justice*, 658 F. Supp. 2d 163, 170 (D.D.C. 2009) (citing *Trans-Pac. Policing Agreement v. U.S. Customs Serv.*, 177 F.3d 1022, 1028 (D.C. Cir. 1999)). Based on the Court's *in camera* review of the documents withheld under Exemption 2, the Court concludes that "the agency has produced all 'reasonably segregable' responsive portions of the documents at issue." *Physicians for Human Rights*, 675 F. Supp. 2d at 170 (citing *Armstrong v. Executive Office of the President*, 97 F.3d 575, 578 (D.C. Cir. 1996)).

## B. Exemption 5

Exemption 5 "protects from disclosure 'inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency.'  To qualify, a document must thus satisfy two conditions: its source must be a Government agency, and it must fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it."  *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001) (quoting 5 U.S.C. § 552(b)(5)). The privileges that are incorporated into Exemption 5 include the attorney-client and deliberative process privileges.  *See Nat'l Labor Relations Bd. v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975).  "The attorney-client privilege protects confidential communications from clients to their attorneys made for the purpose of securing legal advice or services."  *Tax Analysts v. Internal Revenue Serv.*, 117 F.3d 607, 618 (D.C. Cir. 1997).  The privilege also "protects communications from attorneys to their clients if the communications 'rest on confidential information obtained from the client.'"  *Id.* (quoting *In re Sealed Case*, 737 F.2d 94, 98-99 (D.C. Cir. 1984)).  The deliberative process privilege applies to records that are both "'predecisional'" – *i.e.*, "generated *before* the adoption of an agency policy" – and "'deliberative,'" – *i.e.*, "reflect[ive] [of] the give-and-take of the consultative process."  *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980) (emphasis added).  This privilege serves a number of related ends, among them:

> assur[ing] that subordinates within an agency will feel free to provide the decisionmaker with their uninhibited opinions and recommendations without fear of later being subject to public ridicule or criticism; . . . protect[ing] against premature disclosure of proposed policies before they have been finally formulated or adopted; and . . . protect[ing] against confusing the issues and misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action.

*Id.*

The agency has asserted both privileges to justify the withholding or redaction of sixteen documents, which are "e-mail notes of agency employees taken during the process of making a recommendation or determination regarding security." (Def.'s Mem. at 16; *see* Vaughn Index, Docs. 6-21 (asserting attorney-client privilege, deliberative process privilege, or both).) Defendant has invoked Exemption 5 because "[t]hese emails reveal the internal deliberations and preliminary thoughts and approaches of BBG employees in their consideration of Plaintiff Verla Wiley's request to obtain unescorted access in a federal space." (Def.'s Mem. at 16-17.) Based on an *in camera* review of the relevant documents, the Court finds that the agency has properly asserted the attorney-client and deliberative process privileges under Exemption 5. (*See* In Camera Submission, Docs. 6-21.)[17]

## C.      Exemption 6

Exemption 6 permits the withholding of "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy . . . ." 5 U.S.C. § 552(b)(6). In order to evaluate the propriety of withholding information based on privacy concerns, "the Court must balance the individual's interest in privacy against the public interest in disclosure . . . ." *Chang v. Dep't of Navy*, 314 F. Supp. 2d 35, 43 (D.D.C. 2004).

The agency has invoked Exemption 6 to justify the redaction of several emails to remove the name and other information relating to another individual. (*See* In Camera Submission, Doc. 2.) The agency asserts in the Vaughn Index that "there is no public interest in [the redacted] information as it is not responsive to the FOIA request and does not shed light on [the] BBG's

---

[17] The Court also rejects Wiley's challenge to defendant's Exemption 5 redactions as overbroad. (*See* Wiley Opp'n at 35-36.) Based on the Court's *in camera* review of the relevant documents, the Court concludes that defendant has satisfied its obligations to segregate exempt material from nonexempt material. (*See also* Diaz-Ortiz Decl. ¶ 10.)

performance of its statutory duties." (Vaughn Index., Doc. 2.) Accordingly, defendant argues that the release of this information "would shed no light on the operation of [the] BBG and would subject these individuals' 'private affairs [to] unnecessary public scrutiny.'" (Def.'s Mem. at 19 (quoting *Lepelletier v. F.D.I.C.*, 164 F.3d 37, 42 (D.C. Cir. 1999)).

Wiley does not specifically challenge the agency's Exemption 6 redactions. (*See* Wiley Opp'n at 35-37.) "It is therefore proper to treat defendant's argument as conceded." *Franklin v. Potter*, 600 F. Supp. 2d 38, 60 (D.D.C. 2009) (citing cases). Based on this concession and the Court's review of the relevant emails *in camera*, the Court grants defendant's motion as to this issue.[18]

## CONCLUSION

Having considered the pleadings and the entire record herein, and for the foregoing reasons, defendant's motion for summary judgment is granted except as to (1) George Moore's emails, given Carol Durika's failure to sign her declaration; (2) Michael Lawrence's emails, given the unexplained failure of his July 10 electronic search term review to locate a responsive email that he later located on July 28; (3) the paper files of Kataryna Baldwin, Carol Booker, Donna Grace, Timi Kenealy, George Moore, and MaryEllen Righi, given that the agency's declarations state only that those individuals' electronic files were searched; and (4) the records of the Building Security Council or its members, given that there is no evidence that those records were ever searched.

On or before June 17, 2010, defendant shall file a signed version of Durika's previously submitted declaration, and a declaration stating that it has correctly searched the email account of

---

[18] Based on the Court's *in camera* review of the documents redacted under Exemption 6, the Court concludes that the agency has produced all reasonably segregable responsive portions of the documents at issue. *See supra* note 16.

Michael Lawrence (including sent mail) for the search terms identified in his declaration; searched the paper files of Baldwin, Booker, Grace, Kenealy, Moore, and Righi; and searched the records of the Building Security Council (or those of its members) for documents responsive to the FOIA request.

With respect to the four groups of records described above, defendant's motion and plaintiffs' cross-motions for summary judgment will be held in abeyance pending the agency's submission of the relevant declarations. In all other respects, defendant's motion and plaintiffs' cross-motions are denied.

A separate order accompanies this Memorandum Opinion.


_____/s/_____
ELLEN SEGAL HUVELLE
United States District Judge

DATE: May 18, 2010